Littleton, Judge,
delivered the opinion of the court:
This is a suit to recover damages for the failure of the War Assets Administration to deliver 1,765,981 gallons of xylidine to plaintiff pursuant to a contract of sale. The Government defends on the ground that it was justified in refusing delivery because plaintiff had not tendered payment of the purchase price in cash or issued shipping instructions within a reasonable time from the date the contract of sale was. executed.
About 1,900,000 gallons of xylidine were manufactured for the Army Air Force for use as an additive to aviation gasoline. This xylidine, which was stored in the Cactus Ordnance Works, Dumas, Tex., was, in 1945, declared as surplus to the War Assets Administration (hereinafter referred to as the WAA).
Xylidine is used in the chemical industry as an intermediate for the production of commercial dyes. Apart from that manufactured for the Army Air Force, the commercial production of this chemical in the United States amounted to from 40,000 to 50,000 gallons a year. At prevailing consumption levels the 1,900,000 gallons of xylidine represented a 40-year supply.
A market study was made by WAA to determine the possible uses for the surplus xylidine and it was found, among other things, that xylidine could technically be converted into xylenol. Xylenol is a chemical utilized in the manufacture of plastics and resins for which there was a large demand. There was some doubt as to whether the conversion could be made at a cost that would enable it to compete economically with coke-oven xylenol and considerable experimentation would be required to adapt xylidine to aniline uses.
*445 The entire stock of xylidine stored at the Cactus Ordnance Works was advertised for sale in December 1946, f. o. b. location. WAA received four bids. Three bids were for small quantities and the fourth bid (plaintiff’s bid) was for 1,765,931 gallons. Plaintiff was informed by telegram on February 4, 1947, that its bid for the 1,765,931 gallons of xylidine at $0.0612 per gallon was accepted. It was necessary for the Attorney General to approve the sale. His approval was given on March 27,1947, and on April 11,1947, plaintiff was furnished a written sales document containing all the terms and conditions of the contract for the sale of the xylidine. The contract stated that 1,765,931 gallons of xylidine had been sold to plaintiff at a price of $0.0612 per gallon, or for a total price of $108,074.98. The terms were “cash sale” and a note provided “Purchaser to furnish cars in condition for loading.” Under the heading “Ship To” appeared “Will Give.”
On April 14, 1947, plaintiff wrote WAA offering an irrevocable letter of credit in the sum of $108,074.98, which was to be drawn upon as shipments were requested by plaintiff. Payment of the drafts was then to be made 90 days after presentation. The WAA considered the letter of April 14 as an application for credit, because no payment would be made under the terms of the proposed letter of credit until plaintiff decided to issue shipping instructions and had actually been shipped the goods.
WAA wrote plaintiff on May 12,1947, stating that WAA would accept a letter of credit on the following conditions: (1) submission to WAA of a satisfactory irrevocable letter of credit not to expire before January 1, 1948, for the full amount of the sale; (2) supply shipping instructions for the entire quantity of xylidine that would provide for full removal by September 1,1947; (3) present a letter from the terminal to which the property was to be shipped stating that storage space for the entire amount had been contracted for and was available; (4) furnish a performance bond guaranteeing removal of the property by September 1,1947, with a penalty provision of $1,000 per day; and (5) submit the above documents within 10 days. The plaintiff notified *446 WAA that it declined to accept the conditions set forth in the letter of May 12,1947.
The plaintiff was sent a letter by registered mail on August 26,1947, which stated:
This letter will serve as formal notice that unless remittance in full and shipping instructions for the above indicated sale of surplus property are received by this office within ten days from date of notification, this property will be resold for your account.
The plaintiff did not reply to this letter.
On October 15, 1947, plaintiff wrote to the Cactus Ordnance Works requesting that a statement be sent to its accountants, for inventory purposes, showing exactly the merchandise held by WAA for plaintiff. Captain D. M. McCrea, commanding officer of the Cactus Ordnance Works, referred the letter to WAA, which replied to plaintiff by letter dated October 24,1947, stating:
* * * As stated in our letter of August 26,1947, your company is being held in default on a purchase of 1,765,-931 gallons of zylidine [sic]. At the present time we are endeavoring to sell this material for your account with any resulting loss to the Government charged to you.
On November 5,1947, WAA received a telephone call from plaintiff wherein plaintiff stated that it was making arrangements for shipping the xylidine and paying WAA for it. WAA told plaintiff at that time that the contract had been canceled and that any further discussion would have to be on the basis of negotiating a new contract of sale.
On November 21, 1947, WAA was notified by the Army Air Force that it needed the entire quantity of xylidine for its use and that it would take the appropriate action to withdraw the material from surplus and have it transferred to the Air Force. This telephone conversation was confirmed by telegram on November 25,1947.
The plaintiff telephoned a representative of WAA at his home on November 24, 1947, and told him that it had completed arrangements for accepting delivery and would make payment the following day. The representative of WAA informed plaintiff that the Army Air Force had withdrawn the material from surplus and that WAA was justified in releas *447 ing the xylidine to the Air Force because of the failure of plaintiff to comply with the terms of defendant’s letter of August 26, 1947. The plaintiff, on November 25, 1947, tendered a check to WAA for the full amount of the purchase price of the xylidine. The check was refused.
The plaintiff concedes, as it must, that if plaintiff did not pay for the xylidine and issue shipping instructions within a reasonable time that it was in default and defendant had the right to refuse performance or to cancel the contract. The plaintiff argues, however, that it did offer to pay for the xylidine and that it made arrangements to accept delivery within a reasonable time. The facts do not support plaintiff’s argument. The tender by plaintiff on November 25, 1947, was the first time that it offered to pay the purchase price of the xylidine in cash, as required by the contract. Also, plaintiff had no storage facilities for the xylidine, either at the time its bid was submitted or at the time the sales document was issued. It was not until November 24, 1947, that plaintiff made any arrangements for the storage of the xylidine. The plaintiff made no effort at any time during the period covered by this suit to provide cars for loading and removing the xylidine from the Cactus Ordnance Works. Both the tender of cash and the arrangements for storage were after the defendant had declared plaintiff to be in default and after the Air Force had notified WAA that it was withdrawing the xylidine from surplus. We agree with the finding of the commissioner of this court that plaintiff did not provide cars for shipping the xylidine or issue shipping instructions or tender payment of the purchase price in cash within a reasonable time from the date the contract of sale was executed. Therefore, plaintiff was in default and the defendant properly refused to deliver the xylidine to plaintiff. Compare Surplus Properties Corp. v. United States, 120 C. Cls. 709.
The plaintiff contends that if it was in default, the defendant waived this breach of the contract. Again the facts do not support plaintiff’s contention. The terms of the contract required payment in cash and payment was to be made within a reasonable time. The defendant was persistent in its demands for payment and steadfastly maintained, after plain *448 tiff refused to make payment in full and issue; shipping instructions as demanded in its letter of August 26, 1947, that plaintiff had breached the contract and that it was holding plaintiff liable if any loss resulted on resale. The letter from WAA telling plaintiff that unless payment was made within 10 days it was going to be held in default was not even answered by plaintiff. The fact that defendant was aware that plaintiff was continuing its research and experimentation in connection with the conversion of xylidine, under the circumstances above set out, does not amount to a waiver of plaintiff’s breach of contract. The plaintiff’s argument on waiver of the breach of contract is based on discussions and arrangements made with Captain McCrea. Captain McCrea was an Army officer who had no connection with WAA. He was in charge of the Cactus Ordnance Works, and had charge of the storage facilities but he had no authority to act for WAA nor to modify or waive the terms of the contract entered into between WAA and plaintiff.
The plaintiff stated at the trial and the commissioner of this court has found that plaintiff had determined that it was neither advisable nor necessary to pay the purchase price of the xylidine until it had completed its arrangements for the conversion of the xylidine. Provision for the removal of the xylidine from the market without payment, and storage by the Government for an unlimited time, until plaintiff found out whether the conversion could economically be made is not found in the contract of sale and could hardly have been the intention of WAA.
The plaintiff is not entitled to recover, and its petition is therefore dismissed.
It is so ordered.
Laramore, Judge; Madden, Judge; Whitaker, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the briefs and argument of counsel, and the report of Commissioner Wilson Cowen, makes the following findings of fact:
*449 1. During all times pertinent to this case, plaintiff was a New York corporation with its principal office in New York City, New York, and was engaged as a dealer in the business of buying and selling chemicals and chemical supplies.
2. By Act of September 18, 1945 (59 Stat. 538, 50 App. U. S. C., Sec. 1614a, b), the Surplus Property Administration was created as an agency of defendant and was vested with the functions with respect to the disposition of surplus property previously vested in the Surplus Property Board by the Surplus Property Act of 1944 (Act of October 3, 1944, 58 Stat. 765-9, 50 App. U. S. C. 1611 et seq). Effective January 15, 1946, War Assets Corporation was designated by the Surplus Property Administration as the disposal agency for capital and producers’ and ponsumers’ goods. By Executive Order 9689, dated January 31, 1946 (11 F. R. 1265, 1267), the functions of the War Assets Corporation were transferred to the War Assets Administration, effective March 25, 1946.
3. The Surplus Property Act of 1944, Public Law 457,78th Congress, reads in part as follows:
Sec. 11 (a). When any surplus property is reported to any disposal agency under subsection (b) of this section, the disposal agency shall have responsibility and authority for the disposition of such property, and for the care and handling of such property pending its disposition, in accordance with regulations prescribed by the Board.
Sec. 12 (a). It shall be the duty of the Board to facilitate the transfer of surplus property from one Government agency to other Government agencies for their use; and the transfer of surplus property under this section shall be given priority over all other disposals provided for in this Act.
Pursuant to the provisions of the statute, War Assets Administration promulgated, among others, the following regulations, which were in effect at all times pertinent to this suit:
§ 8301.15. Withdrawals. — (a) Personal property. With the consent of the disposal agency, an owning agency may withdraw personal property which it has declared surplus and for which a declaration has been *450 transmitted to such disposal agency pursuant to this part:
*****
§ 8301.18. Authority of disposal agencies to dispose of surplus property. — (a) In general. The disposal agencies designated in this part are hereby authorized and directed to dispose of property declared or assigned to them as surplus. Disposals shall be made in accordance with regulations, orders, and instructions of the War Assets Administrator and those of the Surplus Property Administrator, the Surplus Property Board and the Surplus War Property Administration (created by Executive Order 9425, February 19,1944) which have not been rescinded and superseded, and in accordance with the objectives and provisions of the act.
H* s£ ❖ #
§ 8301.61. Postponement of responsibility of disposal agencies for care and handling of surplus personal property. (a) With the exception of surplus contractor inventory requiring movement to permit reconversion, owning agencies shall continue to be responsible for care and handling of surplus property in their possession and for such other surplus property as may come into their possession.
(b) Shipments to or for disposal agencies by owning agencies shall be made only as and when directed by disposal agencies.
(c) As to contractor inventory which must be moved to permit reconversion, disposal agencies shall be responsible for care and handling to the extent that facilities permit, and may continue to acquire needed additional space. Construction of any additional facilities shall be subject to approval by the Administrator.
(d) Owning agencies shall assist disposal agencies in every possible way to utilize existing space and equipment now owned or controlled by such owning agencies, to the extent necessary to permit quick and orderly plant clearance. Owning agencies shall prepare and maintain such records as will snow full compliance with the provisions of this section and with the applicable provisions of the Surplus Property Act. Reports shall be prepared and filed with the disposal agencies in such manner as may be specified by the Administrator and approved by the Bureau of the Budget in accordance with the Federal Reports Act of 1942.
(e) Disposal agencies shall maintain continuing liaison with each other and with the owning agencies in *451 order to make maximum use of storage space available and to confine shipments of merchandise from one point to another for storage purposes to the minimum consistent with the proper disposal of the property. [Reg. 1, Order 11, Nov. 30, 1946, effective Dec. 6, 1946, 11 F. R. 14074.]
4. Early in World War II, there was manufactured for the Army Air Forces as an additive to aviation gasoline more than 1,900,000 gallons of xylidine. Difficulties were encountered in the use of fuels containing xylidine, and this additive was abandoned in the later stages of the war. In 1945, the entire stock of xylidine, which was stored in the Cactus Ordnance Works, Dumas, Texas, was declared as surplus to the War Assets Administration, hereinafter referred to as the WAA.
5. Xylidine is used in the chemical industry as an intermediate for the production of commercial dyes. Apart from the xylidine manufactured from petroleum for the Army Air Forces, the commercial production of this chemical in the United States amounted to from 40,000 to 50,000 gallons per year and was made from coal tar. At prevailing consumption levels, therefore, the surplus xylidine in storage at the Cactus Ordnance Works represented a 40-year supply of this chemical.
In the latter part of 1946, a market study on xylidine was made for the Chemical Section of the Materials and Supply Sales Division of the WAA. The study suggested several possible uses for the surplus xylidine, including its conversion to xylenol, a chemical utilized in the manufacture of plastics and resins. The report pointed out that, although it was technically possible to convert xylidine into xylenol, there was doubt that such conversion could compete economically with coke-oven xylenol and that considerable experimentation by the purchaser would be required to adapt xyli-dine to aniline uses. For these reasons, it was suggested that the surplus xylidine be advertised on a national program at a low price, scaled at between four and five cents per pound (about 40 cents per gallon), f. o. b. the site.
6. In December 1946, the entire stock of xylidine stored at the Cactus Ordnance Works was advertised for sale by the *452 Fort Worth, Texas, regional office of the WAA, bids being solicited “to purchase all or part of this material (minimum quantity one tank car) f. o. b. location.” The advertisement read in part as follows:
Xylidine is a somewhat toxic liquid which was used during the war as an additive to aviation gasoline to raise the octane rating. The chief civilian uses are in the manufacture of dyes and intermediates. Xylidine can also be used for the following purposes:
(1) Accelerator for rubber;
(2) Wood preservative;
(3) Wetting agent for textiles;
(4) Anti-oxidant for paint pigments;
(5) Frothing agent in ore dressing.
This material is offered, as is, subject to the right of inspection by the prospective purchaser at its location. No warranty is made, either expressed or implied, except as to title.
In addition to the advertisement which was published in the Wall Street Journal and in the Oil, Paint and Drug Reporter, about 7,000 chemical companies were directly circularized,
. 7. On or about the time the advertisement appeared, plaintiff’s representative obtained a sample of the xylidine. In addition, on November 26,1946, the Fort Worth office of the WAA wrote plaintiff as follows in response to an inquiry which had been made by its representative:
H« . ^ ' H*
We have at the Cactus Ordnance Works, Dumas, Texas available quantities of pure Xylidine (CH3), 2C6H3NH2, the molecular weight — 121.18, consisting of 1,881,000 gallons and also 29,000 gallons of this same chemical which contains Nitro-Xylidine, Xylidine byproducts and approximately 50% recoverable Xylidine.
Our Washington Office has authorized us to receive offers for any or all of the above named material. It is necessary that the purchaser supply the cars, and the cars that are routed via Rock Island or Santa Fe should be purged prior to the arrival at the plant. This will be done in Aonarillo, Texas, where they will be cleaned by steam.
*453 8. In response to the advertisement the WAA received four bids as follows :
Company PrleeBid {per gallon) Quantity requested (gallons)
Foster Heaton Co., Paterson, N. J_50.16 8,000
James E. Rudder, Brady, Texas_ .08 24,000
Calco Chemical, Bound Brook, N. J_ . 08 24,000
Republic Chemical Corp., N. Y_ . 0612 1, 765,931
9. Plaintiff’s bid for 1,765,931 gallons of the surplus xyli-dine at $0.0612 per gallon was orally accepted by the regional office of the WAA in Fort Worth, Texas, on February 4, 1947, and plaintiff was informed of this acceptance in a telegram sent by its representative in Fort Worth to its home office in New York on the same date.
In view of the amount which had been expended by the Government in the production of the xylidine, the sale could not be consummated until the WAA obtained an opinion from the Attorney General, pursuant to Section 20 of the Surplus Property Act, that the sale to plaintiff would not violate the antitrust laws. Such an opinion was given on March 27,1947, and thereafter on April 11,1947, the Dallas regional office of WAA, with which the Fort Worth office had then been combined, sent plaintiff a written sales document, setting forth the terms and conditions of the contract for the sale of the xylidine. This document stated that 1,765,931 gallons of xylidine had been sold to plaintiff at a price of $0.0612 per gallon, or for a total price of $108,074.98. The terms were “cash sale” and a note provided “Purchaser to furnish cars in condition for loading.” Under the heading “Ship To” appeared “Will Give.” This document contained all the terms and conditions of the agreement of sale.
10. Xylidine is a toxic liquid requiring special handling in storage and transportation. At the Cactus Ordnance Works, it was stored in tanks with a layer of gas above the xylidine to prevent its oxidation by any air in the tanks.
Plaintiff had no storage facilities for the xylidine, either at the time its bid was submitted or at the time the sales document was issued. As hereinafter stated, it was not until November 24,1947, that plaintiff made any arrangements foy the storage of the xylidine.
*454 .. Plaintiff did not make any effort at any time during the period covered by this suit to provide cars for loading and removing the xylidine from the Cactus Ordnance Works.
11. At the times when plaintiff’s bid was submitted and when the sale was made, it was known both to plaintiff and to many officials of the WAA, that it would be impossible for plaintiff to sell such a large quantity of the xylidine as such, but plaintiff’s president conceived a plan for converting the xylidine into xylenol, a product which is used in the manufacture of plastics and other materials and for which there is a large market in the United States. The evidence establishes that plaintiff did not intend to take possession of or to pay for the xylidine until plaintiff’s plans for converting the xylidine into xylenol on a commercial basis had been developed to the extent that the plaintiff was satisfied that the xylidine could be converted and marketed at a profit.
It was known that it was technically possible to convert xylidine into xylenol, but the process had never been undertaken on a commercial basis. It was not known whether xylenol produced by converting xylidine could compete economically with coke-oven xylenol. Therefore, on April 2, 1947, plaintiff engaged J. J. Berliner & Staff, a research organization in New York City, to make a report on the process of converting xylidine to xylenol.
On April 7, 1947, plaintiff wrote the commanding officer of the Cactus Ordnance Works in Dumas, Texas, requesting that a sample lot of five drums or 250 gallons of the xylidine be shipped to it. The commanding officer of the Cactus Ordnance Works, Captain D. M. McCrea, was an ordnance officer in the War Department. He had no connection with the WAA or with the sale of the surplus xylidine. Consequently, on April 14,1947, he referred the request to the Dallas office of the WAA. The request was apparently approved, because on April 26,1947, the sample lot was shipped in drums by truck line to plaintiff.
12. On February 20,1947, the regional office of the WAA at Fort Worth, sent plaintiff a statement showing that he was indebted to WAA in the sum of $108,074.98. Plaintiff replied by letter of February 28, 1947, stating that it had purchased the xylidine for the amount indicated but that the *455 transaction bad not been approved by the Department of Justice and that plaintiff bad not received the sales invoice.
On April 14,1947, plaintiff wrote the regional office of the WAA in Dallas, Texas, as follows:
Please refer to your sales document #3380884 covering xtlidine. We are requesting our bank, Trade Bank and Trust Company, New York, to issue to you an irrevocable letter of credit in the sum of $108,074.98 so that you may draw on the bank as the xyledine shipments go forward.
As these drafts are presented to the Trade Bank and Trust Company, they will be accepted on a basis of payment ninety days after presentation.
We have, in the past, issued similar letters of credit to other War Assets Administration agencies and they were accepted by them without hesitation.
Your Nashville, Tennessee, regional office accepted a similar letter of credit in the total sum of $180,000.00. All drafts were paid as guaranteed by the bank.
Kindly advise promptly that this is satisfactory to you and our bank will immediately forward the letter of credit to you.
When the above-quoted letter was received, it was considered by the WAA as an application for credit, because no payment would be made under the terms of the proposed letter of credit until plaintiff decided to issue shipping instructions and had actually shipped the goods. Also, the proposed letter of credit provided that payment was not to be made until 90 days after the presentation of drafts with documents attached, showing that shipment had been made. Therefore, plaintiff’s letter was referred through channels to the Credit Division of the New York office of the WAA, since plaintiff’s place of business was located in New York City. The New York office made a report to the Chief of the Credit Division of WAA in Washington, D. C., and at the latter’s instruction, the following letter was sent to plaintiff on May 12,1947:
Mr. Walter M. Day, Director, Credit Division, War Assets Administration, Washington Office, has directed us to make certain arrangements with your corporation before the above referred to sale is consummated. They are:
*456 1. Submission to this office of a satisfactory irrevocable letter of credit not to expire before January 1, 1948 for full amount of sale.
2. Shipping instructions for entire quantity of xyli-dine. Shipping instructions to provide for full removal by September 1, 1947..
3. Letter from responsible official of the terminal to which property is to he shipped stating that storage space for entire amount has been contracted for . and is available.
4. A performance bond executed by a corporate surety guaranteeing removal of the property by September 1, 1947 with a penalty provision of $1,000 per day. The penalty to be paid on demand by WAA. The principal amount of the bond to be the amount of the selling price.
5. All above documents to be in our hands within ten (10) days from date hereof.
After receipt of the letter, plaintiff notified the Chief of the Credit Division of the New York office that plaintiff declined to accept the conditions set forth in the letter. Plaintiff did not then or thereafter, until November 25,1947, make any other tender of payment for the xylidine purchased pursuant to the contract of April 11,1947.
13. From time to time during the period between April 11, 1947, and about August 1,1947, plaintiff’s president conferred with Dr. Bengies, a chemist in the Bureau of Ordnance, War Department, whose suggestions and advice were solicited by plaintiff in connection with its plans for converting xylidine into xylenol.
On several occasions during the same period of time, plaintiff also talked with Colonel Hugh B. Knight, who was Chief of the Chemical Division, War Assets Administration, Washington, D. C. Plaintiff’s president explained to Colonel Knight that plaintiff was engaged in research and laboratory tests in an effort to determine a practical method for converting the xylidine to xylenol. At the same time, plaintiff’s president stated that he realized the large quantity of xyli-dine purchased from the WAA could not be sold as such and Colonel Knight, who concurred in this opinion, furnished plaintiff a copy of the market study which had been prepared for the WAA the latter part of 1946 (finding 5). In *457 these conversations, plaintiff did not request nor did Colonel Knight undertake to make any agreements affecting the contract of sale entered into between plaintiff and the Dallas office of the WAA.
14. During August 1947, Samuel Lerer, a salesman in the Dallas regional office of WAA, who had been assigned the task of collecting the amount due for the sale of the xylidine, conferred with the zone counsel in the regional office regarding plaintiff’s failure to pay for or to issue shipping instructions for the xylidine. The zone counsel telephoned an attorney in the Office of the General Counsel in Washington, D. C., for further proceedings, and, as a result, the following letter was sent to plaintiff by registered mail on August 26,1947:
Re: Sales Document No. 3380884
Date — February 4, 1947
Amount — $108,074.98
Type of property — Zylidine [sic]
Gentlemen: This letter will serve as formal notice that unless remittance in full and shipping instructions for the above indicated sale of surplus property are received by this office within ten days from date of notification, this property will be resold for your account.
Plaintiff did not reply to the letter. The xylidine was not readvertised for sale by the WAA.
15. On August 4,1947, the purchase price of the xylidine was entered as a charge on plaintiff’s books.
On September 12,1947, plaintiff procured insurance in the amount of $110,000 on the xylidine stored at the Cactus Ordnance Works.
16. J. J. Berliner & Staff, the research chemists plaintiff had engaged on April 2, 1947, farmed out the work to a college professor, and on June 25,1947, submitted a written report to plaintiff. During the period between July 25,1947, and October 8,1947, plaintiff employed the Carlstadt Chemical Company to perform laboratory tests in aid of plaintiff’s plans for converting the xylidine. Plaintiff also engaged Foster B. Snell, Inc., a chemical engineering firm, to perform certain services, which were described in a bill rendered to plaintiff by that concern on November 20,1947, as follows:
*458 Professional services rendered to the Oarlstadt Chemical Co., 418 13th Street, Carlstadt, N. J., in high-pressure, high-temperature hydrolysis of aromatic amine to corresponding phenol__ $532.51
In addition to its research, arid experimental activities, plaintiff sent its representatives to various places for the purpose of obtaining information regarding a site for the proposed conversion plant, the equipment to be installed therein and the raw material to be used in the conversion process. About the middle of August 1947, plaintiff sent its representative, J. Nack, to Dumas, Texas, where he conferred with Captain McCrea regarding plaintiff’s use of a part of the xylidine equipment at the Cactus Ordnance Works. Mr. Nack also requested permission to employ the services of The Spencer Chemical Corporation, a company then performing work at the plant under a contract with the Bureau of Ordnance, to furnish designs and operating procedure for the proposed conversion equipment to be operated by plaintiff at or in the vicinity of the Cactus Ordnance Plant. No representative of the WAA participated in these discussions.
17. On October 15,1947, plaintiff sent the following letter to War Assets Administration Storage Area, Cactus Ordnance Works, Dumas, Texas:
.Our accountants Messrs. Marks & Krauss are making an audit of our inventory as of September 80,1947.
We would appreciate your sending them a detailed statement showing exactly the merchandise you were holding for us as of September 30,1947.
The enclosed self-addressed envelope is for your convenience.
# ❖ # ❖
Upon receipt of the above-quoted letter, Captain D. M. McCrea, commanding officer of the Cactus Ordnance Works, referred the letter to the WAA at Dallas, Texas, for handling by that agency. The reply by the WAA was signed by the Chief of the Customer Service Center of the Dallas regional office but was dictated by Mr. Lerer and mailed to plaintiff on October 24,1947. The reply read as follows
Reference is made to your letter of October-15, 1947, which you directed to the Cactus Ordnance Works, *459 Dumas, Texas, regarding your request for a statement concerning merchandise which we were holding for you as of September SO, 1947.
As stated in our letter of August 26,1947, your company is being held in' default on a purchase of 1*765,931 gallons of zylidine [sic]. At the present time we are endeavoring to sell this material for your account with any resulting loss to the Government charged to you. • •
18. On November 5,1947, Mr. Lerer received a telephone call from plaintiff’s representative, Mr. Nack, who said that plaintiff was making arrangements for shipping the xyli-dine and paying WAA for it and that he would be in Dallas in a week or so to discuss the matter. Mr. Lerer told Mr. Nack that he could feel free to call and discuss the subject but that the contract of sale had been canceled upon plaintiff’s failure to comply with the terms .of defendant’s letter of August 26, 1947 (finding 14), and that any discussion would have to be on the basis of negotiating a new contract of sale.
On November 19,1947, Mr. Lerer received a telephone call at his home after office hours from J. J. Darvin, plaintiff’s president, who was then stopping at a Dallas hotel. Mr. Darvin stated that he would like to discuss the xylidine matter with Mr. Lerer, but Lerer refused to go to the hotel and suggested that Mr. Darvin call at the WAA office during regular office hours. Mr, Lerer heard nothing further, from plaintiff or its representatives until November 24, 1947.
19. On November 21,1947, Mr. Lerer received a telephone call from the Army Air Force command at Wright Field, Ohio, and the telephone conversation was confirmed by a telegram of November 25, 1947, which read as follows:
■ TSEPP-1185 CONFIRMING TELEPHONE CONVERSATION 21ST -.1947 BETWEEN TOUR ME SAM LERER AND MESSRS M W SHAYESON AND E O PHILLIPS OP THIS COMMAND. THE EN-TIKE QUANTITY OP APPROXIMATELY ONE MILLION SEVEN-HUNDRED THOUSAND GALLONS ZYLIDINE [sic] NOW STORED AT CACTUS IS DESIRED POR AIR FORCE USE. THIS COMMAND -WILL TAKE ACTION TO WITHDRAW THIS MATERIAL PROM SURPLUS AND TRANSPER IT TO AIR FORCE IMMEDIATELY ON RECEIPT OP YOUR WRITTEN INSTRUCTION. REQUEST ONE PINT SAMPLE REPRESENTATIVE OP EACH STORAGE TANK BE SHIPPED EARLIEST POSSIBLE DATE TO POWER PLANT LABORA- *460 TORT, ENG IV WRIGHT FIELD DAYTON OHIO ARE B ATTN TSEPP-12 MR M W SHAYESON.
AMO WRIGHTFIELD OHIO 21558Z VIA FRWORTH TEX NOV 25
20. On or about November 21, 1947, Mr. Nack arranged for a meeting to be held at the Cactus Ordnance Works, Dumas, Texas, in behalf of plaintiff on November 24,1947. The meeting was attended by plaintiff’s president, J. J. Dar-vin, by chemical engineers employed by plaintiff, by Captain McCrea, by a representative of the Santa Fe Railway Company, and by a representative of the Southwestern Division of the Corps of Engineers, which apparently owned or controlled certain facilities which plaintiff desired to lease. No representative of the WAA attended or participated in the meeting. During the course of the meeting, plaintiff made arrangements to lease a tract of land and other facilities near the Cactus Ordnance Works for the purpose of erecting a plant for the conversion of the xylidine into xylenol. Under these arrangements, the xylidine was to remain in storage at' the Cactus Ordnance Works and be piped from that point to plaintiff’s proposed plant.
Mr. Darvin represented to Captain McCrea that plaintiff was the legal owner of the xylidine stored at the Cactus Ordnance Works and promised that plaintiff’s conversion plant would be in operation by April 1, 1948. As heretofore stated, Captain McCrea was an Army officer, who had no connection with the WAA. He had no authority to act for the WAA nor to modify the terms of the contract entered into between it and plaintiff. However, as commanding officer, Captain McCrea was in charge of the Cactus Ordnance Works and had full authority to arrange for storage facilities at that installation. On the basis of the representations made by Mr. Darvin, Captain McCrea entered into an agreement with plaintiff which was set forth in the following letter, signed by Captain McCrea and addressed to plaintiff on November 24,1947: . .
Confirming conversation with Mr. J. J. Darvin on 24 November 1947, this is your authority to transfer, ship or remove Xylidine purchased by you from War Assets Administration within a period not later than 31 December 1948.
*461 In reference to Par. 1 this letter, the above time limit is predicated upon the construction and operation of a conversion plant not later than 1 April 1948. If conversion plant is not in operation by 1 April 1948 arrangement for transfer of Xylidine from Cactus Ordnance Works must be initiated with prospective or present lessee.
The above authority is based on the fact that the Ee-public Chemical Corporation is the legal owner of Xyli-dine presently stored at this works. Mr. J. J. Darvin has been advised by this office that the Air Corps has indicated that they will purchase Xylidine or request transfer from this plant.
21. About 6:30 p. m. on November 24, 1947, Mr. Darvin telephoned Mr. Lerer at the latter’s home in Dallas, stating that plaintiff had completed arrangements for accepting delivery of the xylidine and that Mr. Darvin would be in Dallas on the following day to make payment of the amount due under the contract of sale. Mr. Lerer replied that since the Army Air Corps had withdrawn the material from surplus it was no longer available. During the same conversation, Mr. Lerer referred to the letter sent to plaintiff by defendant on August 26,1947, and stated that plaintiff’s failure to comply with the terms of that letter justified WAA in releasing the xylidine to the Army Air Corps.
22. On the next day, November 25,1947, plaintiff tendered a check to the WAA for the full amount of the purchase price of the xylidine. The check was sent to the New York office of the WAA with a letter requesting that the check be forwarded to the regional office at Dallas. The check was refused, and plaintiff protested this refusal to the Dallas regional office in a telegram and a letter, both of which were sent on November 28,1947.
23. Plaintiff’s tender of November 25, 1947, was the first time that plaintiff offered to pay the purchase price of the xylidine in cash. Plaintiff had not previously tendered a payment in cash for the material nor made arrangements to ship it, because plaintiff determined that it was neither advisable nor necessary to pay the purchase price of the xylidine until plaintiff had completed its arrangements for the conversion of the xylidine.
*462 Plaintiff did not provide cars for shipping the xylidine, issue shipping instructions, or tender payment of the purchase price in cash within a reasonable time from the date the contract of sale was executed.
24. On May 16, 1947, plaintiff sold one drum containing 450 pounds of xylidine to the General Electric Company at a price of 23 cents per pound or $1.909 per gallon. On November Í4,1947, plaintiff sold two drums containing 860 pounds of xylidine to the General Electric Company at the same price. In the September 29, 1947, issue of- the. Oil, Paint, and Drug Reporter, a trade magazine of general circulation among chemical dealers and chemical companies, the price of xylidine was quoted at a price equivalent to $2.90 per gallon. However, these prices were for small quantities of the chemical. Based on known commercial demands, the xylidine involved in this action, was equivalent to a 40-year supply, and the undisputed evidence shows that there, was no market for such a large quantity of xylidine. Plaintiff’s realization of the fact that there was no market for the xyli-dine caused it to undertake efforts to find an economical and practical method for converting xylidine to a product that could be sold.
There is no evidence in the record as to the probable cost plaintiff, would have incurred in storing and marketing the xylidine over a long period of time.
• i 25. Plaintiff claims the sum of $601,691.17 as the anticipated profits it would have earned had it erected a plant near the Cactus. Ordnance Works, converted, the 1,765,931 gallons of xylidine to xylenol, and sold the xylenol at prices current in. 1947. Neither the college professor who prepared the report submitted to plaintiff by J. J. Berliner & ¡-Staff, nor any other of the other chemists who performed work-for plaintiff in connection with the xylidine, testified at the trial. On the basis of figures contained in the report submitted by the Berliner organization and plaintiff’s knowledge of the current market price of xylenol, plaintiff’s president estimated that a plant for the conversion of the. xylenol could, be constructed and operated at a total cost, including the purchase price of the xylenol, of $1,477,957.98; that 1,236,151 gallons of xylenol would be obtained in the process; *463 that at the current price of xylenol ($1.65 per gallon) it could be sold for a total of $2,039,649.15; that the conversion plant would have a salvage value of $40,000, and that plaintiff’s estimated net profit from the operation would be $601,691.17.
■ The conversion of xylidine to xylenol had never, up to the time of the trial of this case, been undertaken on a commercial basis. The business in which plaintiff proposed to engage, i. e., processing xylenol from xylidine, would have been a new business and, therefore, there are no data from the operation of such a business available for estimating the anticipated profits with reasonable accuracy. There is nothing in the record to indicate the probable cost of shipping and marketing the xylenol, which plaintiff proposed to process •from the xylidine. Consequently, the evidence is too uncertain, remote, and speculative to provide a basis for estimating the amount of plaintiff’s anticipated profits with reasonable accuracy.
26. Plaintiff claims special damages in the amount of $5,208.86. In the development of its plans for the conversion of the xylidine to xylenol, plaintiff incurred the following expenses for research, laboratory testing, materials, personal services, and travel:
April 2, 1947 — J. J. Berliner & Staff: For research and report___ $625. 00
June 25, 1947 — J. J. Berliner & Staff: For research and report__ 625.00
July 21,1947 — Carlstadt Chemical Co.: For laboratory work. 200.00
August 1, 1947 — Jesse Nachsatz: For 200 bags of calcium carbonate__ l, 000.00
August 15, 1947 — J. Nachsatz: Travel expenses to Dumas, Texas, Kansas City, Mo., and return to New York__ 172.20
August 26, 1947 — J. Nachsatz: Personal services for 6 days at $50 per day_• 300. 00
September 29,1947 — J. Naehsatz: Travel expenses to Huntsville, Alabama_,_ 131.97
October 6,1947 — J. Nachsatz: Personal services for 4 days at . $50 per day- 200.00
October 8,1947 — Carlstadt Chemical Co.: For materials_ 169.35
November 7, 1947 — J. Nachsatz: Personal services for two days at $50 per day_ 100.00
November 20, 1947 — Foster D. Snell, Inc.: For professional services_'_ $532. 51
*464 November 21, 1947 — J. J. Darvin: Travel expenses for himself and two others to Kansas City, Mo., Amarillo, Dumas, and Dallas, Texas- 1,000.00
December 2, 1947 — J. J. Darvin: Additional travel expenses on trip to Kansas City, Amarillo, Dumas, and Dallas- 80.00
Total__5,136.03
CONCLUSION OF LAW
Upon the foregoing findings of fact, which, are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and the petition is therefore dismissed.